UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

```
------------------------------x
STEVE ATUAHENE,               :
                              :
     Plaintiff,               :
v.                            : Civil No.3:01CV02269(AWT)
                              :     (MASTER CASE)
CITY OF HARTFORD,             :
                              :
        Defendant.            :
------------------------------x
STEVE ATUAHENE,               :
                              :
     Plaintiff,               :
v.                            : Civil No.3:01CV02270(AWT)
                              :     (MEMBER CASE)
CAPONETTO ENTERPRISES, LLC,   :
PRECISION FOREIGN CAR         :
SERVICE, and VALDIS VINKELS,  :
                              :
        Defendants.           :
------------------------------x
```

**RULING ON MOTION FOR SUMMARY JUDGMENT**

The plaintiff, Steve Atuahene ("Atuahene"), brings one of these consolidated actions against the City of Hartford ("the City"). In Count One of the Amended Complaint against the City (the "Amended Complaint"), Atuahene claims that the City's sale of tax liens, which had accrued against his property at 5 Mannz Street, resulted in an illegal de facto taking and gave rise to an inverse condemnation action. In Count Two, Atuahene seeks relief under 42 U.S.C. § 1983, claiming that the City, while acting under color of state law, deprived him of his Fourteenth Amendment rights to due process. Count Three alleges that the City conspired with Michele Caponetto ("Caponetto"), in violation

of 42 U.S.C. §§ 1985 and 1986, to arrange for Caponetto Enterprises LLC ("Caponetto LLC") to acquire 5 Mannz Street in violation of Atuahene's civil rights. The City has moved for summary judgment, and its motion is being granted.

I.   **Factual Background**

On or about October 30, 1992, Atuahene purchased a parcel of land at 5 Mannz Street, Hartford, Connecticut for the sum of $159,722. At all times relevant to the allegations made in the Amended Complaint, Atuahene was a co-owner of record and manager of 5 Mannz Street, Hartford, Connecticut. By Indenture dated December 15, 1993, and recorded on the Hartford Land Records on April 18, 1994 in Volume 3470 at page 45, Atuahene deeded a 15% interest in 5 Mannz Street to Information Management Group, Inc. and a 10% interest to F.A. Properties Corp.; Atuahene retained a 75% interest. Atuahene, his brother and his wife, Agnes Manu ("Mrs. Manu"), are listed as officers of Information Management Group, Inc.. Atuahene's wife is a co-owner and an officer of F.A. Properties Inc..

Between July 1, 1994 and June 30, 1995, the City sent all notices regarding 5 Mannz Street to "Steve Atuahene, c/o F.A. Properties Co., 1650 Roselyn Street, Philadelphia, PA 19141." Between July 1, 1995 and June 30, 1997, the City sent all such notices to "Information Management Group, 1650 Roselyn Street, Philadelphia, PA 19141." Between July 1, 1997 and June 30, 2001,

the City sent all such notices to Information Management Group, c/o F.A. Properties Co., 1650 Roselyn Street, Philadelphia, PA 19141."[1] (See Ainsworth Aff. ¶ 7.)  Absent an agreement or specific request by the co-owners, the City sends tax bills to the address provided on the conveyance form filed with the Town Clerk's office or the grantee's address provided in the deed.

For the years 1991 through 1996, the City recorded tax liens totaling $24,524.71 against 5 Mannz Street.  Mrs. Manu received a copy of the City of Hartford Tax Collector's Demand regarding 5 Mannz Street, dated February 11, 1998.  On or about June 30, 1998, Caponetto LLC purchased these tax liens from the City.

## II.  Legal Standard

A motion for summary judgment may not be granted unless the court determines that there is no genuine issue of material fact to be tried and that the facts as to which there is no such issue warrant judgment for the moving party as a matter of law.  Fed. R. Civ. P. 56(c).  See Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Gallo v. Prudential Residential Servs., 22 F.3d 1219, 1223 (2d Cir. 1994).  Rule 56(c) "mandates the entry of summary judgment . . . against a party who fails to make a

---

[1] Rather than admit this fact, Atuahene denies it on the basis that "further strict proof is demanded." (Pl. Loc. R. 56(a)2 Statement, ¶ 10).  In the absence of any offer of proof to the contrary, the Ainsworth affidavit sufficiently establishes this fact for the purpose of the instant motion.

showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." See Celotex Corp., 477 U.S. at 322.

When ruling on a motion for summary judgment, the court must respect the province of the jury. The court, therefore, may not try issues of fact. See e.g., Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986); Donahue v. Windsor Locks Bd. of Fire Comm'rs, 834 F.2d 54, 58 (2d Cir. 1987); Heyman v. Commerce & Indus. Ins. Co., 524 F.2d 1317, 1319-20 (2d Cir. 1975). It is well-established that "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of the judge." Anderson, 477 U.S. at 255. Thus, the trial court's task is "carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined . . . to issue-finding; it does not extend to issue-resolution." Gallo, 22 F.3d at 1224.

Summary judgment is inappropriate only if the issue to be resolved is both genuine and related to a material fact. Therefore, the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment. An issue is "genuine . . . if the evidence is such that a reasonable jury could return

a verdict for the nonmoving party." Anderson, 477 U.S. at 248 (internal quotation marks omitted). A material fact is one that would "affect the outcome of the suit under the governing law." Id. As the Court observed in Anderson: "[T]he materiality determination rests on the substantive law, [and] it is the substantive law's identification of which facts are critical and which facts are irrelevant that governs." Id. Thus, only those facts that must be decided in order to resolve a claim or defense will prevent summary judgment from being granted. When confronted with an asserted factual dispute, the court must examine the elements of the claims and defenses at issue on the motion to determine whether a resolution of that dispute could affect the disposition of any of those claims or defenses. Immaterial or minor facts will not prevent summary judgment. See Howard v. Gleason Corp., 901 F.2d 1154, 1159 (2d Cir. 1990).

When reviewing the evidence on a motion for summary judgment, the court must "assess the record in the light most favorable to the non-movant and . . . draw all reasonable inferences in its favor." Weinstock v. Columbia Univ., 224 F.3d 33, 41 (2d Cir. 2000) (quoting Del. & Hudson Ry. Co. v. Consol. Rail Corp., 902 F.2d 174, 177 (2d Cir. 1990)). Because credibility is not an issue on summary judgment, the nonmovant's evidence must be accepted as true for purposes of the motion. Nonetheless, the inferences drawn in favor of the nonmovant must

be supported by the evidence. "[M]ere speculation and conjecture" is insufficient to defeat a motion for summary judgment. Stern v. Trustees of Columbia Univ., 131 F.3d 305, 315 (2d Cir. 1997) (quoting Western World Ins. Co. v. Stack Oil, Inc., 922 F.2d 118, 121 (2d. Cir. 1990)). Moreover, the "mere existence of a scintilla of evidence in support of the [nonmovant's] position" will be insufficient; there must be evidence on which a jury could "reasonably find" for the nonmovant. Anderson, 477 U.S. at 252.

Finally, the nonmoving party cannot simply rest on the allegations in its pleadings since the essence of summary judgment is to go beyond the pleadings to determine if a genuine issue of material fact exists. See Celotex Corp., 477 U.S. at 324. "Although the moving party bears the initial burden of establishing that there are no genuine issues of material fact," Weinstock, 224 F.3d at 41, if the movant demonstrates an absence of such issues, a limited burden of production shifts to the nonmovant, which must "demonstrate more than some metaphysical doubt as to the material facts, . . . [and] must come forward with specific facts showing that there is a genuine issue for trial." Aslanidis v. United States Lines, Inc., 7 F.3d 1067, 1072 (2d Cir. 1993) (quotation marks, citations and emphasis omitted). Furthermore, "unsupported allegations do not create a material issue of fact." Weinstock, 224 F.3d at 41. If the

6

nonmovant fails to meet this burden, summary judgment should be granted.  The question then becomes:  is there sufficient evidence to reasonably expect that a jury could return a verdict in favor of the nonmoving party.  See Anderson, 477 U.S. at 248, 251.

Because the plaintiff in this case is proceeding pro se, the court must read the plaintiff's pleadings and other memoranda liberally and construe them in a manner most favorable to the plaintiff.  See Burgos v. Hopkins, 14 F.3d 787, 790 (2d Cir. 1994).  Moreover, because the process of summary judgment is "not obvious to a layman," Vital v. Interfaith Medical Ctr., 68 F.3d 615, 620 (2d Cir. 1999), the district court must ensure that a pro se plaintiff understands the nature, consequences and obligations of summary judgment.  See id. at 620-621.  Thus, the district court may itself notify the pro se plaintiff as to the nature of summary judgment; the court may find that the opposing party's memoranda in support of summary judgment provide adequate notice; or the court may determine, based on thorough review of the record, that the pro se plaintiff understands the nature of summary judgment.  See id.

After reviewing the record, the court concludes that the plaintiff understands the nature and consequences of, and the obligations of litigants with respect to, summary judgment. First, the plaintiff is an experienced litigant, having been

7

involved in over 20 lawsuits in his capacity as a businessman. (See Atuahene Dep. 91-92). More importantly, the plaintiff's submissions indicate that he understands summary judgment, but simply does not have evidence to withstand it. The plaintiff's opposition to the defendant's motion for summary judgment and his memorandum in support of his own motion for summary judgment, properly identify the legal standard applicable to a motion for summary judgment. The plaintiff attempts to show that there exist genuine issues of fact, but there simply are none.

### III. Discussion

#### A.   The De Facto Taking / Inverse Condemnation Claim

Count One of the Amended Complaint sets forth two distinct legal theories for Atuahene's claim that the City accomplished a <u>de facto</u> taking of his property. First, Atuahene alleges that between October 31, 1992 and June 30, 1998, he did not receive any notice of tax assessment, tax delinquency or the accrual of tax liens with respect to his property at 5 Mannz Street. (See Amended Comp. ¶¶ 11-12.) According to Atuahene, the City's subsequent sale of those tax liens without proper notice resulted in a <u>de facto</u> taking of his property. Second, Atuahene alleges that the City sold the tax liens to Caponetto LLC pursuant to an illegal agreement which enabled Caponetto LLC to "seize" 5 Mannz Street. (See Amended Comp. ¶¶ 21-23.) Atuahene claims that the City accomplished a <u>de facto</u> taking of Atuahene's property by

8

conspiring with Caponetto to arrange for Caponetto LLC's acquisition of 5 Mannz Street.

As to Atuahene's first legal theory in Count One, the City has demonstrated that there is no genuine issue of material fact as to whether the City provided Atuahene with effective notice of the accrual of tax liens against 5 Mannz Street. Generally, when litigation is initiated to deprive individuals of their property, due process is satisfied by "notice *reasonably calculated*, under all circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." Mullane v. Central Hanover Bank & Trust Co., 339 U.S. 306, 314 (1950). "The proper inquiry is whether the state acted reasonably in selecting means likely to inform persons affected, not whether each property owner actually received notice. As long as the state employs means 'such as one desirous of actually informing the [property owner] might reasonably adopt to accomplish [that purpose],' then it has discharged its burden." Weigner v. City of New York, 852 F.2d 646, 649 (2d Cir. 1988) (quoting Mullane, 339 U.S. at 315).

Between July 1994 and June 2001, the City sent various tax notices regarding 5 Mannz Street to Atuahene, which, under all the circumstances, were reasonably calculated to apprise him of the accrual of tax liens against his property. First, between July 1, 1994 and June 30, 1995, the City sent all notices

9

regarding 5 Mannz Street to Steve Atuahene, c/o F.A. Properties Co., 1650 Roslyn Street, Philadelphia, PA 19141.  During the relevant period, Mrs. Manu was an officer, owner and operator of F.A. Properties Co..  Additionally, the mailing address of F.A. Properties Co. is the same address as a building owned by F.A. Investment Inc., a company in which Atuahene owns a 33% interest.  Given that during this period the notices were sent to Atuahene "care of" a company owned and operated by his wife, they were reasonably calculated to reach Atuahene.  Second, between July 1, 1995 and June 30, 1997, the City sent all notices regarding 5 Mannz Street to Information Management Group, 1650 Roslyn Street, Philadelphia, PA 19141.  As Atuahene was an officer of Information Management Group (Atuahene Dep. 21), these mailings were also reasonably calculated to provide him with notice of the pendency of tax liens against 5 Mannz Street.  Third, between July 1, 1997 and June 30, 2001, the City sent all notices regarding 5 Mannz Street to Information Management Group, c/o F.A. Properties Co., 1650 Roslyn Street, Philadelphia, PA 19141.  As noted above, Atuahene was an officer of Information Management Group and his wife co-owned and operated F.A. Properties Co..  These facts support the conclusion that the notices issued during this period were constitutionally sufficient.

    Additionally, Atuahene has not presented any evidence to dispute the City's evidence that absent an agreement or specific

request by the co-owners, the City sends tax bills to the address provided on the conveyance form filed with the Town Clerk's office or the grantee's address provided in the deed. It is therefore established that Atuahene effectively consented to receive tax bills at the addresses to which they were sent. Finally, Atuahene admits that Mrs. Manu actually signed for and received the February 11, 1998 Tax Collector's Demand.

The court concludes that, under all the circumstances described above, the City's mailings between July 1, 1994 and June 30, 2001 regarding 5 Mannz Street were reasonably calculated to apprise Atuahene of the tax status of his property. Consequently, the City's sale of tax liens to Caponetto LLC did not deprive Atuahene of property without the notice required by due process.

As to Atuahene's second legal theory in Count One, he claims that the City accomplished a <u>de</u> <u>facto</u> taking of his property when it sold tax liens to Caponetto LLC pursuant to an illegal agreement that ultimately led to Caponetto LLC's seizure of the property. The City has demonstrated that there is no genuine issue of material fact as to whether its sale of tax liens to Caponetto LLC was anything other than a legitimate exercise of its authority. Moreover, Atuahene has failed to adduce any facts that could support a conclusion that the City's sale of tax liens was executed pursuant to an illegal agreement

11

which enabled Caponetto LLC to "seize" 5 Mannz Street.  While Atuahene concedes, as he must, that the tax lien sale did not convey the property itself to Caponetto LLC,[2] he asserts that the tax lien sale was executed pursuant to an illegal, informal agreement between the City and Caponetto and that the aim of the agreement was to transfer the property to Caponetto LLC.  There is no evidentiary support for Atuahene's contention that the City entered into an agreement with Caponetto to deprive him of his property.  Atuahene's deposition makes it clear that his allegation that the City conspired with Caponetto for the purpose of taking his property is based only on mere speculation and

---

[2]   Q.   Are you aware that what was sold to Mr. Caponetto were tax liens and not the property itself?  Do you understand the difference?

A.   Yeah, I understand the difference.

Q.   Are you aware of that?

A.   Mr. Caponetto did not understand the difference, and that's the problem.

(Atuahene Dep. 52-53.)

Q.   So Michele Caponetto has a misunderstanding about what he can do, and that gives you the right to sue the City of Hartford?

A.   That is -- that is up to -- that is up to the City and the courts to decide.  If the City - the court will decide whether the City has the right to give Michele Caponetto, whether wrongly or rightly, to give Michele Caponetto the green light to seize my property.

(Atuahene Dep. 54.)

conjecture:

> Q. How does the City know that you're black?
>
> A. . . . Caponetto testified that he called the mayor. That is -- that even makes it clear. Caponetto can take a phone and call the mayor and say, "What the hell are you doing? I need this property that belongs to a black person in Philadelphia." The mayor called whoever it is and sees that he gets the property. Caponetto has the capacity even to call the mayor of Hartford.
>
> Q. How do you know what he said to the mayor?
>
> A. What he said is not important. What is important is the results here. And the results is that after talking to the mayor -- after talking to the mayor, Caponetto got the property without due process of law.

(Atuahene Dep. 71-72.)  Then, in response to a question concerning his claims arising under 42 U.S.C. §§ 1985 and 1986, Atuahene stated:

> A. I think I made it clear that the City conspired with Caponetto to deprive of my property and civil rights. So that is self-evident. I am not saying Caponetto did it alone. I probably - <u>I don't have evidence at this stage</u>. I believe that somebody in the City might have called Caponetto that there's a lien on this property, if you do A, B, C, you can have the property. And Caponetto did that. <u>I believe that that might have been one possible scenario.</u>

(Atuahene Dep. 76)(emphasis added).  Thus, it is clear that Atuahene's theories concerning an alleged agreement between the City and Caponetto are without any evidentiary support.

Having failed to come forward with specific facts that could show that the City's sale of tax liens was executed pursuant to an illegal agreement, Atuahene is left only with the

13

argument that the tax lien sale itself constituted a de facto taking.  In Connecticut, a claimant may bring an inverse condemnation action "when there has been a taking, without compensation, for a public purpose, without an actual or physical appropriation of property."  Citino v. Redev. Agency of Hartford, 51 Conn. App. 262, 278 (1998).  See also Bauer v. Waste Management of Conn., Inc., 234 Conn. 221, 249 n.15 (1995) (quoting United States v. Clarke, 445 U.S. 253, 255-58 (1980)) (inverse condemnation is "a shorthand description of the manner in which a landowner recovers just compensation for a taking of his property when condemnation proceedings have not been instituted").  An inverse condemnation action may be based on a theory of de facto taking, which occurs when a taking authority substantially interferes with the owner's property without exercising its power of eminent domain.  See Citino, 51 Conn. App. at 280 (citing Textron, Inc. v. Wood, 167 Conn. 334, 345 (1974)).

 As the City has demonstrated, the tax lien sale itself did not substantially interfere with Atuahene's property.  First, Conn. Gen. Stat. § 12-195h authorizes any municipality to "assign, for consideration, any and all liens filed by the tax collector to secure unpaid taxes on real property," and Atuahene retained the power to discharge the liens at all times.  Second, the City has not physically interfered with 5 Mannz Street in any

manner.  Third, Caponetto LLC's efforts to foreclose on the tax liens and its physical entry onto the property do not support Atuahene's claim that the City substantially interfered with his property.  Moreover, Atuahene has not met his limited burden of responding to the City's showing that it acted pursuant to lawful authority without substantially interfering with his property.  Summary judgment is therefore being granted in favor of the defendant with respect to Atuahene's de facto taking and inverse condemnation claims.

### B.   42 U.S.C. § 1983

In Count Two of the Amended Complaint, Atuahene claims that the City, while acting under color of state law, deprived him of his Fourteenth Amendment rights to due process.

A municipality is subject to liability under Section 1983 for the unconstitutional acts of its employees if the acts in question were carried out in "execution of a government's policy or custom."  Monell v. Dep't of Soc. Servs., 436 U.S. 658, 690-94 (1978); see also Walker v. City of New York, 974 F.2d 293, 296 (2d Cir. 1992).  A municipality may not be held liable under 42 U.S.C. § 1983 for the alleged constitutional violations of its employees below the policy-making level solely on the basis of the doctrine of respondeat superior.  See Monell, 436 U.S. at 694; DeCarlo v. Fry, 141 F.3d 56, 61 (2d Cir. 1998).  Instead, to hold a municipality liable, a plaintiff must establish that the

15

moving force behind the constitutional violation was an official policy or custom of the municipality. See Monell, 436 U.S. at 690-94; Dwares v. City of New York, 985 F.2d 94, 100 (2d Cir. 1993); see also Vippolis v. Village of Haverstraw, 768 F.2d 40, 44 (2d Cir. 1985) (holding that in order to establish municipal liability, a plaintiff "must first prove the existence of a municipal policy or custom"). The question of which officials hold policy-making authority within a governmental body is a question of law. See Jett v. Dallas Indep. Sch. Dist., 491 U.S. 701, 737 (citing St. Louis v. Praprotnik, 485 U.S. 112 (1988)). The existence of a policy sufficient to impose municipal liability can be found in either: (a) a discriminatory policy enactment or other action adopted by a municipality's legislative or other policy-making body or (b) the discriminatory actions of a final policy-maker in a matter within his authority. Jett, 491 U.S. at 736-39.

The plaintiff has failed to create a genuine issue of material fact as to whether the alleged constitutional violations were carried out pursuant to a discriminatory, official policy or custom. It is undisputed that the City has an official policy providing for the sale of tax liens, which requires purchasers of tax liens "to submit either a developer's profile or a description of their intended use of the property after the liens have been foreclosed upon." (Ainsworth Aff. § 14.) Under this

16

policy, "[w]hen [the City] sells the liens recorded against property[,] it is up to the purchaser of the liens to take whatever steps they deem necessary to collect amounts owed." (Id.)  Atuahene does not mount a facial challenge to this policy.[3]  Rather, the thrust of Atuahene's argument is that the City's principal policy-makers, including the Mayor, implemented this policy in violation of Atuahene's civil and property rights by having telephone conversations with Caponetto in which they gave him the "inside-track" on acquiring the tax liens.  Atuahene has presented nothing beyond mere speculation and conjecture to support his contention that such telephone calls occurred.  Moreover, assuming arguendo that policy-makers did consult with Caponetto regarding the tax liens files against 5 Mannz Street, Atuahene has failed to adduce any evidence that could support a conclusion that they did so in a manner that violated Atuahene's civil or property rights.  Summary judgment is therefore being granted in favor of the City with respect to Atuahene's Section 1983 claim.

### C. 42 U.S.C. §§ 1985 and 1986

In Count Three of the Amended Complaint, the plaintiff

---

[3] Atuahene lists of variety of policies, customs and practices which he claims are responsible for the alleged violations, including the City's failure to implement adequate hiring, training and supervisory procedures.  (See Amended Comp. ¶ 59.)  Atuahene has presented no evidence as to the existence of such policies, customs and practices.

makes a claim pursuant to 42 U.S.C. § 1985 that the City and Caponetto conspired against him.  "The four elements of a § 1985(3) claim are: (1) a conspiracy;  (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of equal protection of the laws, or of equal privileges and immunities under the laws;  (3) an act in furtherance of the conspiracy;  (4) whereby a person is either injured in his person or property or deprived of any right of a citizen of the United States.  Furthermore, the conspiracy must also be motivated by 'some racial or perhaps otherwise class-based, invidious discriminatory animus behind the conspirators' action.'"  Mian v. Donaldson, Lufkin & Jenrette Securities Corp., 7 F.3d 1085, 1087-88 (2d Cir. 1993) (citing United Bhd. of Carpenters, Local 610 v. Scott, 463 U.S. 825, 828-29 (1983)).  Here, for the reasons discussed in Part III.A., there is no evidence that could support a finding that the City and Caponetto conspired against Atuahene or that there was a conspiracy motivated by racial or some other invidious discriminatory animus.

In addition, the plaintiff makes a claim pursuant to 42 U.S.C. § 1986.  Section 1986 "provides a cause of action against anyone who 'having knowledge that any of the wrongs conspired to be done and mentioned in section 1985 are about to be committed and having power to prevent or aid, neglects to do so.'"  Mian, 7 F.3d at 1088 (citing Katz v. Morgenthau, 709 F.Supp. 1219, 1236

(S.D.N.Y. 1989), aff'd in part and rev'd in part on other grounds, 892 F.2d 20 (2d Cir. 1989)). "Thus, a § 1986 claim must be predicated upon a valid § 1985 claim." Id. (citing Dacey v. Dorsey, 568 F.2d 275, 277 (2d Cir. 1978)). Since summary judgment is being granted as to the § 1985 claim, it must also be granted as to the § 1986 claim.

For the reasons set forth above, the City of Hartford's Motion for Summary Judgment (Doc. No. 29) is hereby GRANTED. Judgment in favor of the City of Hartford shall enter with respect to all the claims against it. The remaining claims in this case are those against Caponetto Enterprises, LLC, Precision Foreign Car Service and Valdis Vinkels, which are set forth in the Complaint dated December 5, 2001.

It is so ordered.

Dated this 2nd day of March 2006 at Hartford, Connecticut.

/s/
Alvin W. Thompson
United States District Judge