Case 3:01-cv-02269-AWT    Document 84-2    Filed 07/14/2006    Page 1 of 23

Athuahene vs. Caponetto
8/13/2003                                                    Steve Atuahene

Page 1

```
 1
 2                   UNITED STATES DISTRICT COURT
                       DISTRICT OF CONNECTICUT
 3
 4   STEVE ATUAHENE        : CIVIL ACTION NO.
     VS.                   : 3:01CV2270(AWT)
 5   CAPONETTO ENTERPRISES :
     LLC                   :
 6                         :
     PRECISION FOREIGN CAR :
 7   SERVICE, INC. AND     :
                           :
 8   VALDIS VINKELS, ESQ.  :
 9
10       DEPOSITION OF: Steve Atuahene
         DATE: August 13, 2003
11       HELD AT: Gersten & Clifford, 214 Main Street,
         Hartford, Connecticut
12
13   APPEARANCES:
14   REPRESENTING CAPONETTO ENTERPRISES LLC, PRECISION FOREIGN
     CAR SERVICE, INC. AND PRO SE:
15   LAW OFFICES OF VALDIS VINKELS
     216 Main Street
16   Hartford, CT 06106
     (860) 541-6400
17   By: Valdis Vinkels, Esq.
18   PRO SE:
     Steve Atuahane
19   7000 Woodbine Avenue
     Philadelphia, PA 19151
20   (215) 877-5981
21   ALSO PRESENT: Agnes Atuahene
22
23       REPORTER: KATHLEEN A. MORIN, LIC./REG. NO.: 00078
              BRANDON SMITH REPORTING SERVICE, LLC
24                  44 Capitol Avenue
               Hartford, Connecticut 06106
25                  (860) 549-1850
```

7bc853b9-2e32-48d8-a774-0ea760a3a76a

Athuahene vs. Caponetto

8/13/2003                                                    Steve Atuahene

Page 2

```
  1                           INDEX

  2

  3

  4    WITNESS: Steve Atuahane

  5

  6         DIRECT         CROSS        REDIRECT        RECROSS

  7            4

  8

  9

 10

 11

 12    EXHIBITS:                              PAGE:

 13

 14    Defendants' Exhibit 1, Notice of Deposition.....4

 15

 16

 17

 18

 19

 20    ** Exhibit retained by Attorney Vinkels

 21

 22

 23

 24

 25
```

7bc853b9-2e32-48d8-a774-0ea760a3a76a

Athuahene vs. Caponetto

Page 3

1                           STIPULATIONS

2

3

4       It is stipulated by the attorney for the Plaintiff

5   and Defendant that each party reserves the right to make

6   specific objections in open court to each and every

7   question asked and the answers given thereto by the

8   witness, reserving the right to move to strike out where

9   applicable, except as to such objections as are directed to

10  the form of the question.

11

12      It is stipulated and agreed between counsel for the

13  parties that the proof of the authority of the Commissioner

14  before whom this deposition is taken is waived.

15

16      It is further stipulated that any defects in the

17  notice are waived.

18

19      It is further stipulated that the reading and

20  signing of the deposition transcript by the witness is not

21  waived.

22

23

24

25

7bc853b9-2e32-48d8-a774-0ea760a3a76a

Athuahene vs. Caponetto

Page 4

```
 1                (Deposition commenced at 10:01 a.m.)

 2

 3

 4           STEVE ATUAHENE, Deponent, having first been

 5   duly sworn, deposes and states as follows:

 6

 7

 8           DIRECT EXAMINATION BY MR. VINKELS

 9

10      Q.   Mr. Atuahene, would you, please, state your

11   name and address?

12      A.   Steve Atuahene, 7000 Woodbine Avenue,

13   Philadelphia, PA.

14      Q.   You are here pursuant to this notice of

15   deposition, dated August 4, 2003; is that correct?

16      A.   That is correct.

17           MR. VINKELS:  Would you mark this as D1.

18

19           (Defendants' Exhibit 1, Notice of Deposition,

20           marked for identification)

21

22      Q.   (By Mr. Vinkels)  The notice asks you to bring

23   several documents.

24           Do you have any checks or evidence of payment

25   of the note to Charles Ayers, secured by a mortgage on
```

7bc853b9-2e32-48d8-a774-0ea760a3a76a

Athuahene vs. Caponetto

8/13/2003                                                        Steve Atuahene

Page 5

1    5 Mannz Street, Hartford?

2            A.    No.

3            Q.    Do you have any copies of checks or other

4    evidence of payment of real estate taxes for 5 Mannz

5    Street, Hartford?

6            A.    There was no taxes on that property.

7            Q.    So you don't have any, right?

8            A.    There was no taxes on that.  There was no taxes

9    on that property.

10           Q.    So the answer is, "No," right?

11                 Do you have copies of checks or other evidence

12   of payment of real estate taxes for 5 Mannz Street?

13           A.    No, the answer is, "Not necessarily."  There was

14   no taxes on that property so there wouldn't be any checks.

15           Q.    The question isn't whether you owed taxes.  The

16   question is whether you've paid any taxes.

17           A.    The question implies that there was tax owed.

18   There's no tax owed.

19           Q.    Do you have any copies of checks or other

20   evidence of payment of water charges to the Metropolitan

21   District Commission, on 5 Mannz Street, Hartford?

22           A.    I don't understand much about that -- from --

23           Q.    Do you have any copies of checks or evidence of

24   payment to the Metropolitan District?  If you don't

25   understand what it is, then --

7bc853b9-2e32-48d8-a774-0ea760a3a76a

Athuahene vs. Caponetto

8/13/2003

Steve Atuahene

Page 6

```
 1         A.    I don't understand the question.

 2         Q.    Read 3 on Schedule A.

 3         A.    (Witness complying).

 4         Q.    It's going to be a long day, isn't it?

 5         A.    No, no.  Okay.

 6         Q.    The answer is?

 7         A.    No.

 8         Q.    Did you bring copies of any petitions or any

 9    other communications with the City of Hartford by you or

10    any entity with which you're associated?  Read 4 of

11    Schedule A.

12         A.    Do you have a copy of this so that it's not

13    back and forth?

14         Q.    Let me see if I have a copy.  Here we go.  Just

15    hang onto that.  I'll repeat my question.

16               Do you have any of the documents that are

17    requested by Number 4 of Schedule A?

18         A.    I don't have.

19         Q.    Do you have any of the documents that are

20    requested by Number 5 of Schedule A?

21         A.    No.

22         Q.    Do you have any of the matters requested in

23    Paragraph 6 of Schedule A?

24         A.    I give the -- the request for document in

25    Number 6, I give it to the City of Hartford.  I don't have
```

Brandon Smith Reporting Service

Athuahene vs. Caponetto

8/13/2003                                                    Steve Atuahene

Page 7

1   it.

2        Q.   Do you have any of the matters requested by

3   Paragraph 7 of Schedule A?

4        A.   No.

5        Q.   Did there come a time when you became the owner

6   of 5 Mannz Street, Hartford?

7        A.   Yes.

8        Q.   Did you become the owner by yourself?

9        A.   Yes.

10       Q.   When was this?

11       A.   In and around October 1992.

12       Q.   Do you still own this property?

13       A.   No.

14       Q.   When did you stop owning the property?

15       A.   When defendants and the City of Hartford took

16   the property.

17       Q.   When was that?  What was the date?

18       A.   I'm not precisely sure of the date, but

19   somewhere between 1997 and 1998.

20       Q.   So it is your testimony that the most precise

21   date you can give me is a two-year span.

22       A.   No, I said, between 1997 and 1998.

23       Q.   What month in 1997 and what month in 1998?

24       A.   I'm not sure because I don't live here.  I

25   don't know when the eminent domain was effected.  The

7bc853b9-2e32-48d8-a774-0ea760a3a76a

Athuahene vs. Caponetto

8/13/2003                                                    Steve Atuahene

Page 8

1    property was taken by eminent domain, and I'm not sure when

2    precisely it was taken, but my correct knowledge is that

3    between the period in 1997 and 1998, the property was seized

4    by the defendants.

5          Q.    Is it between January 1, 1997 and December 31,

6    1998?

7          A.    Maybe.

8          Q.    You don't know?

9          A.    No.

10         Q.    Do you know that it was in 1997?

11         A.    I know that it was between 1997 and 1998.

12         Q.    So it was not in 1996?

13         A.    Pardon me?

14         Q.    It was not in 1996.

15         A.    I don't have the precise date.  Eminent domain had

16   taken this.  When the precise taking took place, I don't

17   know.  My assessment is that such an action might have been

18   taken prior to 1997, but I was given some information that

19   they did it in 1997 and 1998 --

20         Q.    When --

21         A.    -- when the property was seized.

22         Q.    When did you first receive notice that the city

23   acquired the property by eminent domain?

24         A.    I first got a notice as far back as 1996, and

25   at that time, the defendant and his company -- Mr. -- the

7bc853b9-2e32-48d8-a774-0ea760a3a76a

Athuahene vs. Caponetto

Steve Atuahene

Page 9

1    principal of the company, Mr. Michele Caponetto, had taken

2    properties of mine on that property.

3         Q.    That was not the question.

4              The question was: What notice did you get from

5    the City of Hartford that the property was taken by eminent

6    domain?

7         A.    You asked that question.  Please let me answer

8    the question, to the best of my knowledge.

9         Q.    You're talking about Mr. Caponetto --

10        A.    Let me answer the question to the best of my

11   knowledge.  The property was taken -- I was aware that

12   Mr. Michele Caponetto had taken some properties on this

13   property as far back as somewhere around, maybe, 1996,

14   1997.

15        Q.    When did you receive notice of the fact that

16   Mr. Caponetto had taken some property of yours, apparently?

17        A.    He took a truck and --

18        Q.    When did you receive that notice?

19        A.    I went in there one day --this was as far back

20   as 1996, 1997.

21        Q.    Was it 1996 or was it 1997?

22        A.    I answered that question.  I said that between 1996

23   and 1997, I became aware that, yes, he took a truck that

24   belonged to me and was using it for his warehouse.

25        Q.    My question -- going back a few questions ago --

Brandon Smith Reporting Service

7bc853b9-2e32-48d8-a774-0ea760a3a76a

Athuahene vs. Caponetto

Page 10

1    my question was, what notice did you receive from the City

2    of Hartford that it took the property by eminent domain?

3              A.    Oh, from the City of Hartford?

4              Q.    Yes, from the City of Hartford?

5              A.    If you understand the nature of eminent domain,

6    the question is moot.   Eminent domain doesn't happen by the

7    city.   If the city takes action, then it's not eminent domain.

8              Q.    So did the city take any action that you're

9    aware of with respect to this property?

10             A.    My understanding is that the defendant Michele

11   Caponetto told me, somewhere in July or August of 1998, that

12   he purchased the property from the City of Hartford.

13             Q.    Did you receive any notice from the City of

14   Hartford that it became the owner of the property, "Yes" or

15   "No"?

16             A.    No.

17             Q.    Thank you.

18                   Now, going to Paragraph 12 of your complaint --

19             A.    Do you have a copy here?

20             Q.    Yes, I have it.

21             A.    I have mine.   Okay, I'm ready.

22             Q.    It says, "In and around 1997, Precision and

23   Caponetto Enterprises LLC seized the 5 Mannz Street

24   property and sold many equipments, tools, furniture,

25   machinery, truck and van and the building.   He also took

Athuahene vs. Caponetto

8/13/2003                                                          Steve Atuahene

Page 11

1    off the billboard of the building."  When did this take

2    place?

3            A.   What took place?

4            Q.   The allegations contained in Paragraph 12?

5            A.   I told you that before, between 1996 and 1997,

6    this action had been taken.  I became aware of this

7    somewhere around 1997, but the action itself, the seizure

8    of these properties, took place prior to my knowledge.

9            Q.   So it is your testimony that sometime, I guess,

10   in 1996 or in 1997, the defendant Caponetto entered your

11   property, removed great amounts of personal property and

12   sold that property; that is your testimony?

13           A.   It's my testimony that in 1997, Caponetto --

14   Michele Caponetto and Caponetto LLC took many equipment,

15   tools, furnitures, machinery, trucks, van and the building.

16           Q.   That's your testimony.

17                When did you first become aware of the fact

18   that this took place?

19           A.   I said that and I will answer again, in or

20   around 1997.

21           Q.   Was your building secured?

22           A.   Yes.

23           Q.   How did Mr. Caponetto get access to the

24   building if it was secured?

25           A.   You should ask Mr. Caponetto.

7bc853b9-2e32-48d8-a774-0ea760a3a76a

Athuahene vs. Caponetto

Page 12

```
1          Q.    No.  What evidence did you have -- what

2     evidence did you see yourself that the personal property

3     was taken by anybody?

4          A.    I was --

5          Q.    Was there evidence of a break-in?

6          A.    I was on the property myself, and a truck that

7     belongs to me was being used by Mr. Caponetto.  I

8     questioned him and he alleged at that time that it was

9     given to him by somebody, which wasn't true.

10         Q.    Was there any other property that was taken

11    from your property -- any property of yours that was

12    removed from 5 Mannz Street?

13         A.    I went to that property -- there was certain

14    things missing.

15         Q.    What was missing?

16         A.    The specificity has been defined at Paragraph

17    12 of my complaint.

18         Q.    Once again, your building was secured, right?

19         A.    That's correct.

20         Q.    Was there any evidence of any breaking and

21    entering at any point?

22         A.    When I came in there, the property was open at

23    that particular time.  Mr. Caponetto was using some of my

24    properties, so you conclude.

25         Q.    You said that the property was open.  Is that what
```

7bc853b9-2e32-48d8-a774-0ea760a3a76a

Athuahene vs. Caponetto

Page 13

1    you said?

2         A.   At that particular time when I went in and I

3    saw that Mr. Caponetto was using that property.

4         Q.   So your allegation is that Mr. Caponetto stole

5    some property from you that belonged to you.

6         A.   Yes.

7         Q.   Did you report this fact to the police?

8         A.   No.

9         Q.   Did you report this to anybody?

10        A.   Did I report to anybody?

11        Q.   That Mr. Caponetto stole your property?

12        A.   No.  When I talked to Mr. --

13        Q.   Did you or did you not?  Did you report to

14   anybody whether or not Mr. Caponetto --

15        A.   No.  Can I finish?

16        Q.   No.  The question requires a "Yes" or "No"

17   answer.  Did you or did you not?

18        A.   I can't answer "Yes" or "No," for the simple

19   reason that --

20        Q.   Did you report the fact that the property was

21   stolen by Mr. Caponetto, to anybody?

22        A.   Yes.

23        Q.   To whom?

24        A.   That is what I want to explain.

25        Q.   To whom?

7bc853b9-2e32-48d8-a774-0ea760a3a76a

Athuahene vs. Caponetto

Page 14

```
 1            A.    I questioned Mr. Charlie Ayers because

 2   Mr. Caponetto had told me that Charlie Ayers asked him to

 3   take this properties.  Mr. Ayers denied that he ever gave

 4   Mr. Caponetto those properties.

 5            Q.    What property are we talking about, just the

 6   truck, or something else?

 7            A.    The truck.  And as I said, at that particular

 8   time, the property was open.

 9            Q.    How did it come to be open?  Did somebody break

10   down a gate or something?  Did somebody break down a door?

11   What happened?

12            A.    Ask Mr. Caponetto.

13            Q.    No.  You went to the property.  What did you

14   see when you entered upon the property?  How was it open?

15            A.    Okay, this is what I saw:  One, I saw that

16   Mr. Caponetto was using the property -- especially he has --

17            Q.    You're not being responsive.

18            A.    Please, let me finish.  He was using the truck.

19   The door was open.  I asked him what was going on.  He told

20   me that this property was given to him by Charlie Ayers.

21            Q.    Now, you said that you secured the property.

22            A.    I secured the property.

23            Q.    Had you locked it?

24            A.    It was boarded.  It was boarded -- locked and

25   boarded.
```

Athuahene vs. Caponetto

8/13/2003                                                    Steve Atuahene

Page 15

1          Q.    So it is your testimony that somebody broke the

2    lock and remove the boards from the property?

3          A.    That's correct.

4          Q.    Did you report that fact to the police?

5          A.    No, because Mr. Caponetto already told me that

6    he was authorized to take it.

7          Q.    When was this?

8          A.    Somewhere in 1997.

9          Q.    That's the best recollection you can give me is

10   somewhere in 1997?

11         A.    We're talking about six years ago.

12         Q.    Was it the spring of 1997?

13         A.    I don't remember.

14         Q.    Was it the summer of 1997?

15         A.    I don't remember.  I know that it was in 1997.

16         Q.    Was it the fall of 1997?

17         A.    I don't remember.

18         Q.    Was it the winter of 1997?

19         A.    I don't remember.  I remember in my notes --

20   indicated 1997.

21         Q.    Did you make any notes to yourself of this

22   occurrence?

23         A.    What?

24         Q.    Did you make any notes to yourself as to what

25   happened and when?

Brandon Smith Reporting Service

7bc853b9-2e32-48d8-a774-0ea760a3a76a

Athuahene vs. Caponetto

Page 16

```
 1          A.   I made notes and the notes that was made was

 2     1997.  I was in Hartford and I saw Mr. Caponetto and

 3     Mr. Caponetto told me that he had been authorized, the

 4     properties was given to him by Charlie Ayers.

 5          Q.   So the note that you made to yourself was

 6     undated except for the fact that it said, "1997."

 7          A.   It just note on the top "1997."

 8               THE COURT REPORTER:  Can you slow down, please,

 9     and let him finish his question.  Thank you.

10          Q.   (By Mr. Vinkels)  To repeat the question.  You

11     made a note to yourself and the only date on that note was

12     1997.

13          A.   That's correct.

14          Q.   What evidence do you have that Mr. Caponetto or

15     anybody sold any of your equipment, tools and furniture,

16     machinery and truck?  That's your allegation.

17          A.   What evidence do I have?

18          Q.   That he sold the equipment, tools, furniture,

19     machinery, truck and van?

20          A.   The evidence I have is the fact that when I

21     went in there, he told me that he was -- these properties

22     was -- the truck and others, were given to him by Charlie

23     Ayers.  I confronted Charlie Ayers.  Charlie Ayers said he

24     never told him that, so from that point, I knew that he had

25     taken it, but more important, he had told some a lot of
```

Athuahene vs. Caponetto

8/13/2003                                                    Steve Atuahene

Page 17

1    people that he bought -- that he owned the property.

2         Q.   So your testimony is that the only piece of

3    evidence that you have to support the allegation that

4    Mr. Caponetto sold the properties is that he told you that he

5    sold the properties; is that correct?

6         A.   He told me that -- that's not my only evidence

7    alone.  He told me -- one, he told me that he was given

8    this property by Charlie Ayers.  I confront Charlie Ayers,

9    Charlie Ayers says, "No."  Second --

10        Q.   The question --

11        A.   Please let me finish.  Second, he told me that

12   he had purchased the property from the City; third, he's

13   using the property for his business.  All those three

14   considered, I believe that he took the property.

15        Q.   Your allegation says that he sold these items

16   of property.  What evidence do you have to support that

17   allegation?

18        A.   Because the properties are not there.

19        Q.   Are not where?

20        A.   Are not at the property.  The particular items

21   that we are talking about, cited in Paragraph 12 of my

22   pleading -- my complaint, is not in the property at 5 Mannz

23   Street.

24        Q.   I'll ask you again.  How do you know that Mr.

25   Caponetto took this property?

7bc853b9-2e32-48d8-a774-0ea760a3a76a

Athuahene vs. Caponetto

8/13/2003                                          Steve Atuahene

Page 18

1        A.   Because he's using -- he's in control of the

2   property.  He's in control of the property.

3        Q.   He's in control of 5 Mannz Street?

4        A.   That's correct.

5        Q.   How did he happen to be in control of 5 Mannz

6   Street?

7        A.   He claims that the City sold -- he bought the

8   property from the City.  He told me.  He told a lot of

9   people.

10       Q.   Did you --

11       A.   He had admitted in the deposition that he told

12   some people.

13       Q.   So you're saying to me that the only evidence

14   that exists that Mr. Caponetto seized this property is that

15   he told you he seized it; is that correct?

16       A.   That's what I say.

17       Q.   What did you say?

18       A.   I gave you a whole lot of reasons.  First, he

19   told me that this property was given to him by Charlie

20   Ayers, which Charlie Ayers denied.  He told me that he has

21   bought the property from the City of which the City denies

22   it.  Third, he's using this property for his business --

23   from these three factors.

24       Q.   So far --

25       A.   I believe my conclusion, he has taken this

7bc853b9-2e32-48d8-a774-0ea760a3a76a

Athuahene vs. Caponetto

Page 19

1   property.

2       Q.   So far, the only name you've mentioned in your

3   answer is Mr. Caponetto.  I'll repeat my question.

4            Is there any evidence that you have that the

5   property was seized by Mr. Caponetto other than his

6   statements to you?

7       A.   Yes.

8       Q.   What?

9       A.   Other than his statements to me?

10      Q.   Yes.

11      A.   His behavior.

12      Q.   So the evidence that you have that the property

13  was seized -- wait a minute.  The property was seized by

14  whom, Mr. Caponetto or the City?

15      A.   The property was seized by both people, and by

16  "seized" here, Mr. Caponetto is using the property.  He

17  claims that he bought the property from the City.  Whether

18  that's a valid claim or not, he has deprived me of this

19  property, so he has seized this property from me in

20  violation of the Fourth Amendment of the United States

21  Constitution.

22      Q.   So one more time:  The evidence of seizure is

23  that you showed up sometime in '97 or '98 and you found

24  that the property was open and all of your personal

25  property was gone, and Caponetto had some personal property

7bc853b9-2e32-48d8-a774-0ea760a3a76a

Athuahene vs. Caponetto

Page 20

1     and that's it.  Anything else?

2            A.    That he told me that the City -- he bought the

3     property from the City.

4            Q.    And he told you that, okay.  That's it, okay.

5     Thank you.

6                  Let's see.  There's some allegation someplace

7     in your complaint, I think, that Mr. Caponetto removed the

8     billboard from the property.

9            A.    That's correct.

10           Q.    What evidence do you have that he did this?

11           A.    The evidence that I have is that he's in

12    control of that property, but more important, in my

13    deposition, when I questioned him, he was waffling.  He

14    first said that he never did it, and then, later on, he

15    admitted that he may have.  From that conclusion, I think

16    it's clear to see that Mr. Caponetto took off the board.

17           Q.    So one more time:  What you're saying to me

18    then is that the evidence that you have that Mr. Caponetto

19    took down the billboard is what he said in his deposition;

20    is that true?

21           A.    No.  It's what he said in his deposition, that

22    is one, and his behavior, that is two.

23           Q.    What behavior?

24           A.    The behavior that he never told me -- he

25    couldn't tell us the truth.

7bc853b9-2e32-48d8-a774-0ea760a3a76a

Athuahene vs. Caponetto

Page 21

1          Q.    So again, to repeat my question:

2               You base this allegation on the fact that in

3     your judgment, Mr. Caponetto's deposition indicated to you

4     that he took the billboard.

5          A.    In my judgment, Mr. Caponetto, first, his

6     deposition, he mentioned that he took the billboard;

7     second, the fact that he had seized the property, the

8     property is under his control, means that he took the

9     billboard; third, he was using the property that didn't

10    belong to him.  All of this behavior and the circumstances

11    of events surrounding this indicate that he took the

12    board.

13         Q.    Interesting.  Paragraph 13 of your complaint

14    says that the defendants, Precision and Caponetto

15    Enterprises, bought the property from the City of Hartford.

16    What evidence do you have of that allegation, to support

17    that allegation?

18         A.    I answered that question.  Michele Caponetto

19    told me that he bought the property from the City of

20    Hartford.

21         Q.    Did you check with the City of Hartford?

22         A.    I didn't have to.

23         Q.    The answer is, "No"?

24         A.    No.

25         Q.    Now, in Paragraph 16, you state that it

Athuahene vs. Caponetto

8/13/2003                                                    Steve Atuahene

Page 22

1    happened in 1998 -- it says, "In 1998, you became aware

2    that Caponetto Enterprises legally seized the property."

3         A.    Yes.

4         Q.    1998 that you first became aware of this.

5         A.    1998 is when I became -- he told me -- in 1998,

6    somewhere in June, July, August, that he told me that the

7    City -- he bought that property from the city.

8         Q.    You bought this property in 1992, right?

9         A.    Yes.

10        Q.    How often did you go to the property in 1992

11   after you bought it, approximately.

12        A.    I was on the property.

13        Q.    How often did you visit the property in 1992?

14        A.    I visited the property, occasionally, maybe --

15   between 1992 and 1994, 1995 --

16        Q.    The question --

17        A.    Let me finish.

18        Q.    No.  Let me phrase my question.  The question

19   is, how often did you visit the property in 1992?

20        A.    I was on the property in 1992.  The question is

21   not "How often?"  I was operating in 1992.

22        Q.    Every day?

23        A.    Yes.  I was in the building.  I was operating

24   the software business between 1992 and somewhere around

25   1994, 1995.  I was on the property.

7bc853b9-2e32-48d8-a774-0ea760a3a76a

Athuahene vs. Caponetto

8/13/2003                                                    Steve Atuahene

Page 23

1          Q.    Thank you.

2                You were on the property in 1993 every day; is

3    that correct?

4          A.    That's correct.

5          Q.    You were on the property every day in 1994; is

6    that correct?

7          A.    Somewhere -- not every day, but I was there.

8          Q.    How often in 1994, approximately?

9          A.    I was there frequently in 1994, yes.

10         Q.    Once a month?

11         A.    I won't characterize, "Once a month."  It might be

12   every -- once a month, I may come there twice or the other

13   month, I may come there maybe once or maybe even three

14   months.  I may come there once, depending upon the activities

15   that I have to do.

16         Q.    In 1995, how often did you visit the property?

17         A.    I visited it less often than 1994.

18         Q.    Once a month?

19         A.    No.

20         Q.    Once every six months?

21         A.    More than every six months -- once every six

22   months.

23         Q.    So you were on the property twice in 1996 --

24   I'm sorry.

25                Can you repeat my question.  Did I say 1995 or

7bc853b9-2e32-48d8-a774-0ea760a3a76a