Athuahene vs. Caponetto

8/13/2003                                                      Steve Atuahene

Page 24

1    1996?

2                    THE WITNESS:  1995.

3                    THE COURT REPORTER:  Yes, 1995.

4         Q.    (By Mr. Vinkels)  How often did you visit the

5    property in 1996?

6         A.    1996, I visited it probably about three or four

7    times.

8         Q.    Every time you went there in 1996, was the

9    building secured?

10        A.    Yes.

11        Q.    How often did you visit the property in 1997?

12        A.    1997 -- I might have visited it in 1997 about

13   twice.  I'm not sure.

14        Q.    Was the property secured both times?

15        A.    Yes.

16        Q.    How often --

17        A.    Every day I went there, it was secured until

18   after 1998.

19        Q.    Okay, so --

20        A.    1997 -- somewhere in 1997, as I said, when

21   Caponetto told me when he seized some properties and he

22   told me that Ayers gave it to him, after that, we boarded

23   the property and left.  And in 1998, I came --

24        Q.    Wait, the question is:  You visited the

25   property in 1997 how many times and you said "Twice."  Is

7bc853b9-2e32-48d8-a774-0ea760a3a76a

Athuahene vs. Caponetto

8/13/2003                                                    Steve Atuahene

Page 25

1    that your testimony?

2           A.    About twice.  That's what I said.

3           Q.    And your testimony was that the property was

4    secured both times.

5           A.    Yes.

6           Q.    1998, how often did you visit the property?

7           A.    1998, I visited the property about three times.

8           Q.    Three times?

9           A.    Yes.

10          Q.    Was the property secured each time in 1998?

11          A.    1998, at the time that I went there, the

12   property was not secured.  Michele Caponetto was using the

13   property at that time.  It was at that time that he told me

14   that he bought the property from the City of Hartford.

15          Q.    So when you say "secured," I take it that you

16   mean the property was boarded up and locked.

17          A.    Before 1998.

18          Q.    Yes, during --

19          A.    That's correct.

20          Q.    Boarded up and locked.

21                So in 1998, there came a time when you went to

22   the property and the property was no longer boarded up and

23   the doors were open; is that correct?

24          A.    That's correct.

25          Q.    I'm sorry to be redundant, but to repeat the

7bc853b9-2e32-48d8-a774-0ea760a3a76a

Athuahene vs. Caponetto

8/13/2003                                                          Steve Atuahene

Page 26

1    question:  You did not call the police at this point.

2            A.    No.    No.    Mr. Caponetto was using the property.

3    He told me that he already bought the property from the

4    City.  It was no more my property, so it was none of my

5    business to protect his property.

6            Q.    Turning your attention to a different topic:

7                  Paragraph 20 of your complaint states that you

8    had a contract to sell the property.

9            A.    Yes.

10           Q.    Was the contract in writing?

11           A.    Prepared in writing, but by the time it had to

12   be signed, the guy was -- I was -- both of us were

13   unavailable and before 1998, the guy called me and said

14   that Caponetto told him that he owned the property, so he

15   didn't buy it.

16           Q.    Did you have a contract with somebody or not?

17           A.    Pardon?

18           Q.    Was there a piece of paper signed by both

19   parties?

20           A.    No.  We prepared the agreement to be signed,

21   but time didn't allow it and before we could sign it, the

22   guy called me and said that the property -- Caponetto said

23   that he owned the property, so how can we go ahead?  I said,

24   "Okay, I will take care of it."

25           Q.    So the testimony is that this piece of paper

Athuahene vs. Caponetto

8/13/2003                                                      Steve Atuahene

Page 27

1    was not signed.

2           A.    That's correct.

3           Q.    Do you have a copy of that piece of paper?

4           A.    No, I don't have a copy with me.

5           Q.    Do you have it anyplace?

6           A.    I tried to find it.  I couldn't find it, so I

7    cannot say that I have it anyplace.

8           Q.    So you lost that piece of paper?

9           A.    As of now, I don't have it in my possession.

10          Q.    But you understand that you're under a

11   continuing duty to give it to me --

12          A.    When it becomes available -- when any of this

13   becomes available, it will be provided to you immediately.

14          Q.    What was the date of this proposed transaction?

15          A.    We started the transaction somewhere in 19 -- I

16   think we were talking in '95.  We became serious in 1996.

17   At that time, we said that we -- I said that we have to put

18   this in writing.  That was in 1996.  And then, in 1997, we

19   were going to meet and we couldn't meet.  In 1998, we were

20   going to meet and the guy called me and said that, "I

21   understand that the property had been taken -- I mean,

22   purchased by -- the City sold the property to Michele

23   Caponetto."  "How do you know?"  I say.  "I went to the

24   property and Mr. Caponetto told me."

25          Q.    When did you prepare this proposed contract, to

7bc853b9-2e32-48d8-a774-0ea760a3a76a

Athuahene vs. Caponetto

8/13/2003

Steve Atuahene

Page 28

1    the best of your knowledge?

2        A.    I think, from writing, it was somewhere around

3    1997 when I put it in writing, but between 1995 and 1996,

4    we had a good concept of that.  The only thing is that we

5    were acquiring a new machinery to replace the old one for

6    -- so we weren't sure if we wanted to sell it or not, but

7    we have an agreement and that agreement was dependent upon

8    that decision.  Then in 1998, we wanted to sign this, and

9    then he learned that the property had been taken.

10        Q.    So you prepared the agreement in 1997 and

11    presented it to the prospective purchaser.

12        A.    That is correct.

13        Q.    And he called you back and said that he's not

14    going to sign it because you did not own the property; is

15    that correct?

16        A.    All he told me is, "I think that the property

17    already been sold because Caponetto told me he bought it

18    from the City," so that became moot because I knew from the

19    understanding of the eminent domain, the City has the right

20    to take over property at any time, so if he told me that he

21    bought it from the City --

22        Q.    So what is the name of this prospective

23    purchaser?

24        A.    Herbert, I think.

25            MS. ATUAHENE:  Herb Virgo.

Athuahene vs. Caponetto

8/13/2003                                                          Steve Atuahene

Page 29

1                  THE WITNESS:  Herb Virgo, V-I-R-G-U (sic).  Herb

2    Virgo.

3          Q.   (By Mr. Vinkels)  Virgo, as in the

4    constellation.

5               The first name?

6          A.   Herbert.

7          Q.   Herbert?

8          A.   I knew him by Herb.

9          Q.   Where did he live?

10         A.   He lived in Hartford.  I don't know the precise

11   address, but he lived in Hartford.

12         Q.   Lived in Hartford?

13         A.   Yes.

14         Q.   In the deposition with the City of Hartford, I

15   understand that one of the factors that, in your mind,

16   produced the result that the property was owned by

17   Caponetto was that he parked his car on your property.

18         A.   He did what?

19         Q.   He parked his car on your property; is that

20   correct?

21         A.   That's one of the reasons.  The major reason is

22   that he's using this property for his business.

23         Q.   Specifically, what objective facts do you have

24   that indicate that he uses the property for his business?

25         A.   His car is on the property every day.  His car

7bc853b9-2e32-48d8-a774-0ea760a3a76a

Athuahene vs. Caponetto

Page 30

1    is on the property every day, and he admitted that he

2    parked his car there.  His business is the repair of cars,

3    so when he finishes or when he's waiting to repair the

4    cars, he puts his property there.  He told people that they

5    can't park there because he owns the property.  That

6    doesn't -- that's nothing that -- more than can be derived,

7    that he owns the property and he's using this property for

8    his use, but more important, in his application to the

9    city, he said he wanted this property for expansion of his

10   businesses and he's using this property for that particular

11   purpose.

12          Q.    It's your testimony that Mr. Caponetto parks

13   his automobiles on your property?

14          A.    That's correct.

15          Q.    What used to be your property.

16                Did this take place in 1997?  Did you see this

17   for yourself?  Did you see any of his cars on your

18   property?

19          A.    In 1997?

20          Q.    Yes.

21          A.    What time?

22          Q.    You're right.  Let's do this, specifically.

23                In 1997, did you see any of his cars on your

24   property?

25          A.    No.

Athuahene vs. Caponetto

8/13/2003                                                      Steve Atuahene

Page 31

1          Q.    Did you see any cars on your property that

2     didn't belong to you?

3          A.    No.

4          Q.    In 1998, did you see any of his cars on your

5     property?

6          A.    Yes.

7          Q.    How did you know they were his cars?

8          A.    Pardon?

9          Q.    How did you know they were his cars?

10         A.    Interesting.  More than ten times, I seen him

11    parking the cars on that lot.

12         Q.    In 1998?

13         A.    Since 1998.

14         Q.    No.  I'm talking about 1998 now.  In 1998 --

15    well, first of all, how many times did you go to the

16    property in 1998?

17         A.    I answered that question.  I answered, "Three

18    times or so."

19         Q.    Now, were his cars on the property each time

20    you were there?

21         A.    Yes.

22         Q.    Again --

23         A.    I took some pictures.  The City of Hartford has

24    some of the pictures.

25         Q.    From 1998?

7bc853b9-2e32-48d8-a774-0ea760a3a76a

Athuahene vs. Caponetto

Page 32

1          A.    From 1998 up to this time.

2          Q.    No.   I'm talking about 1998 now.   Your

3    photographs, going back to 1998, are of his automobiles on

4    your property.

5          A.    Yes.

6          Q.    Were there --

7          A.    I'm not sure --

8          Q.    Were there any automobiles on this property

9    other than his?

10         A.    No.   As a matter of fact, the neighbors told me

11   that he had warned them that nobody can park his car there

12   because he owns the property.

13         Q.    Who said that?   I'm sorry --

14         A.    The neighbors.

15         Q.    What neighbors?

16         A.    The neighbors -- the people who live in that

17   neighborhood.

18         Q.    So, specifically, you talked to somebody and

19   that person said that he told him that he couldn't park the

20   car there.

21         A.    That's correct, because he owns the property.

22         Q.    When was that?

23         A.    Several times when we had been there, between

24   -- from -- since 1998, whenever we go there, we talk to the

25   people who live in the neighborhood and each time they

8/13/2003

Steve Atuahene

Page 33

1    confirm that they can't park there because he said he owns

2    the property.

3        Q.    But you don't know any names -- what the names

4    are?

5        A.    No, I don't have the names here, but I know the

6    people when I see them.

7        Q.    How many cars would you say -- let's say, 1998

8    -- first of all, is this property fenced in?  Do you have

9    it fenced in?

10       A.    No.

11       Q.    Is there a fence between Mr. Caponetto's

12   property and this property?

13       A.    Yes, I think it's a small fence, but it's open.

14   Mr. Caponetto can get in.  Mr. Caponetto can walk --

15   without any gate -- there's no gate there.  Mr. Caponetto

16   can walk in from -- Mr. Caponetto's property is adjacent to

17   my property, so he walks in.

18       Q.    So it is your testimony that there is -- well,

19   does this fence have a gate?

20       A.    Pardon.

21       Q.    Does the fence between your property -- the 5

22   Mannz Street and Mr. Caponetto's property, does it have a

23   gate?

24       A.    No.

25       Q.    Does not, okay.

7bc853b9-2e32-48d8-a774-0ea760a3a76a

Athuahene vs. Caponetto

8/13/2003                                                          Steve Atuahene

Page 34

1              A.    From what I've seen, I haven't seen a gate.

2              Q.    What steps did you take, if any, to prevent the

3      neighbors from parking on your property?

4              A.    What?

5              Q.    What steps have you taken to stop the

6      neighbors --

7              A.    What time frame are you talking about?

8              Q.    I'm sorry?

9              A.    What time?

10             Q.    What town?

11             A.    What period of time are you talking about?

12             Q.    Let's start in 1996.  In 1996, did you take any

13     steps to prevent the neighbors from parking on your

14     property?

15             A.    No, nobody parked on that property.

16             Q.    Nobody ever parked on that property in 1996?

17             A.    No.

18             Q.    Mr. Caponetto nor any of the neighbors?

19             A.    At that particular time, no.

20             Q.    In 1997, none of the neighbors parked on that

21     property?

22             A.    No.  Whenever I went there, there was nobody

23     parked in there.

24             Q.    Did you have "No Trespassing" signs on the

25     property?

Athuahene vs. Caponetto

8/13/2003                                                            Steve Atuahene

Page 35

1          A.    Pardon?

2          Q.    Did you have "No Trespassing" signs on the

3    property?

4          A.    No.  When we were doing business there, we

5    didn't have anything.  The neighbors knew us.

6          Q.    When did you stop doing business there?

7          A.    I stopped doing business there somewhere in

8    1995.

9          Q.    Stopped in 1995?

10         A.    Yes.

11         Q.    Did you then put up "No Trespassing" signs?

12         A.    No, because we agreed to sell it or use it for

13   expansion.

14               THE COURT REPORTER:   "Because we agreed to sell

15   it or use it for expansion"?

16               THE WITNESS:   For expansion, yes.

17         Q.    (By Mr. Vinkels)  But it's your testimony that

18   you went to this property three to four times after that,

19   that you had "No Trespassing" signs and the property was

20   enclosed by a fence.

21         A.    No, there was no illegal parking that I'm

22   aware, except in 1998 when Caponetto took over.

23         Q.    On another topic:  It was your testimony that

24   you owned this property since 1992; is that correct?

25         A.    It's my testimony that between 1992 and 1998, I

Brandon Smith Reporting Service

7bc853b9-2e32-48d8-a774-0ea760a3a76a

Athuahene vs. Caponetto

Steve Atuahene

Page 36

1    assumed that I owned the property, except for a short

2    period that Michele Caponetto went in there and took some

3    portion of my properties, but in actual, I owned it.  In

4    1998, it's my testimony that Caponetto bought -- alleged

5    that he bought the property from the City, so at that

6    particular time, I ceased to own the property.

7            Q.   Did you pay any real estate taxes on this

8    property to the City of Hartford during the time that you

9    owned it?

10           A.   Did I do what?

11           Q.   Did you pay any real estate taxes to the City

12   of Hartford for the period of time that you owned this

13   property?

14           A.   The period of time that I owned the property,

15   there was no taxes due.

16           Q.   So the answer is, "No."  Thank you.

17                So it's your claim that no taxes were ever due

18   on this property?

19           A.   Before it was taken over by the City, that is

20   correct.

21                MR. VINKELS:  Off the record.

22

23                (Off-record discussion was held at 10:49 a.m.)

24

25                MR. VINKELS:  Back on.

Athuahene vs. Caponetto

8/13/2003

Steve Atuahene

Page 37

1              (Deposition reconvened at 10:50 a.m.)

2

3        Q.    (By Mr. Vinkels)   Something puzzles me.

4        A.    Sure, I'll be glad to explain it.

5        Q.    In the deposition that the attorney for the

6    City of Hartford took of you -- let me ask you this

7    question -- a different topic entirely.

8              You're aware that Mr. Caponetto of Caponetto

9    Enterprises commenced a tax foreclosure against you in

10   October of 1998.

11             MR. VINKELS:  Can you read back the question.

12

13             (Question read back)

14

15             THE WITNESS:  I'm not aware of the specific

16   date, but I'm aware there was a foreclosure action

17   initiated.

18       Q.    (By Mr. Vinkels)   But at this time,

19   Mr. Caponetto already owned the property.

20       A.    That's correct, so there was no need for the

21   foreclosure action.

22       Q.    Yet you resisted it vigorously.

23       A.    There was no need --

24       Q.    Did you defend the foreclosure action?

25       A.    Did I defend the foreclosure action?

Brandon Smith Reporting Service

Athuahene vs. Caponetto

8/13/2003                                                                 Steve Atuahene

Page 38

1          Q.    Yes.

2          A.    Yes, I have to defend it because it was not

3    necessary.  My conclusion is that the City and Caponetto

4    owned the property, so it was not necessary.  If you are

5    making me a part of the suit, then I have to defend my

6    dignity.

7          Q.    What was the relief -- what did Mr. Caponetto

8    in his complaint -- so it is your testimony that you

9    defended this foreclosure action because it was unnecessary

10   and because you had to maintain your dignity.

11         A.    That's correct, and I thought it was frivolous.

12         Q.    Thank you.

13               In your deposition with the City of Hartford, on

14   Page 13, Question, "Did you make an effort to find out if

15   you had to pay taxes in Hartford?"  Answered by you, "I

16   made an effort and assessed it.  I have a petition pending

17   for a petition 'nunc pro tunc.'"  Question, "When did you

18   file that petition?"  Answer, "I filed that when I became

19   aware that they claim there's taxes owed."

20         A.    Which page is it?

21         Q.    I'm on Page 13.

22         A.    15?

23         Q.    13.

24         A.    13?  Mine is different.  Excuse me.

25         Q.    All right.  Page 49, Page 13 of the --

Athuahene vs. Caponetto

Steve Atuahene

Page 39

1       A.    49, okay.   49/13?

2       Q.    Yes.   Do you want me to go through this again?

3       A.    Yes.

4       Q.    Question, "Did you make an effort to find out

5   if you had to pay taxes in Hartford?"  Your answer, "I made

6   an effort and assessed it.  I have a petition pending for a

7   petition 'nunc pro tunc.'"  Question, "When did you file that

8   petition?"  Your answer, "I filed that when I became aware

9   that they claim that there's taxes owed."  Question, "What

10  year was that?"  Your answer, "Last year."  Question,

11  "Well, last year was 2001."  Your answer, "Sure."

12          Mr. Caponetto became the owner of this property

13  in 1998.

14      A.    Um-hmm.

15      Q.    Why were you filing petitions to the City in

16  2001?

17      A.    Because the tax law allows somebody to petition

18  "nunc pro tunc" when he has been denied of certain rights.

19  In this particular case, the City was supposed to first

20  send a notice of assessment, send assessment, and then,

21  provide us the right to defend the assessment.  In this

22  scope, we were denied due process.  The obvious relief we

23  can seek is to go back to that body and ask them to

24  reconsider the case because we were not notified, and I

25  took that appropriate action, and that is not in accord

7bc853b9-2e32-48d8-a774-0ea760a3a76a

Athuahene vs. Caponetto

8/13/2003                                                            Steve Atuahene

Page 40

 1    with the tax law.

 2            Q.    Do you have a copy of that petition?

 3            A.    No, not right now, but the City has a copy.

 4            Q.    Do you have a copy of this petition?

 5            A.    Not right now.

 6            Q.    Do you have it someplace?

 7            A.    I believe that I have it someplace.  When I

 8    was coming here, I searched for it.  I couldn't find it,

 9    but I believe I have it someplace.

10            Q.    That's one of the documents that I asked you to

11    produce.

12            A.    That's what I'm saying, because you asked me to

13    produce it, I searched for it.  I didn't find it, but I

14    might have dumped it somewhere, but the city tax assessor's

15    office has a copy.

16            Q.    Has the City given you an answer to this

17    petition?

18            A.    No.

19            Q.    Going back to 1991, from whom did you purchase

20    this property?

21            A.    Charlie Ayers.

22            Q.    How did you pay for the property?

23            A.    I don't remember.  It's a matter of public

24    record.

25            Q.    Did you pay cash for it?

Athuahene vs. Caponetto

Page 41

1       A.    Both cash and mortgage.

2       Q.    How much cash did you pay?

3       A.    I don't remember.

4       Q.    Do you have any copies of the closing

5    statements?

6       A.    No, I don't have it, but I guess the lawyers

7    have it.  You can subpoena them.  They will give it to you.

8       Q.    Did you pay any cash at all?

9       A.    Yes.

10      Q.    Was it more than $1,000?

11      A.    It was more -- if I -- it was more than $25,000.

12      Q.    How much?

13      A.    I think it was probably somewhere more than

14   $40,000.

15      Q.    $40,000 in cash?

16      A.    I think so.

17      Q.    More?

18      A.    More.

19      Q.    You signed a note for the rest of the purchase

20   price?

21      A.    That's correct.

22      Q.    To whom?

23      A.    To Charlie Ayers.

24      Q.    Did you ever --

25      A.    It's a matter of public record.

7bc853b9-2e32-48d8-a774-0ea760a3a76a

Athuahene vs. Caponetto

Page 42

```
 1          Q.    Yes.

 2                Did you ever make any payments on this note?

 3          A.    No, because he didn't comply with his part of

 4     the agreement.

 5          Q.    Did Mr. Ayers sue you on this note?

 6          A.    Yes.

 7          Q.    Did he recover a judgment against you?

 8          A.    No.

 9          Q.    He did not recover a judgment against you?

10          A.    No.

11          Q.    Your testimony is that Mr. Ayers did not

12     recover a judgment --

13          A.    What do you mean by "recover"?

14          Q.    Obtain in court a judgment against you.

15          A.    Yes, he got a judgment in his favor, if that is

16     what you are saying.

17          Q.    I think that's what I'm saying.

18          A.    Yes.  He recovered -- my understanding of

19     "recovered" means did he get any money from me, but --

20          Q.    Precisely.  He obtained a judgment against you?

21          A.    That's correct.

22          Q.    But he did not recover because you did not pay.

23          A.    That's correct.

24          Q.    Did you ever make any payments to the

25     Metropolitan District for water usage?
```

Athuahene vs. Caponetto

8/13/2003                                                                    Steve Atuahene

Page 43

1        A.    Did I ever?  Yes.

2        Q.    When?

3        A.    Within the time that we were operating, we paid

4   all our municipal taxes.

5        Q.    Well, your testimony is that you paid municipal

6   taxes?

7        A.    Yes.  We did pay all the taxes that were

8   supposed to be due.  We did pay taxes that were due, yes.

9   The taxes I'm talking about there was no assessment, but

10  when we went to settlement, we paid the taxes.

11       Q.    You stopped operating in 1995; is that right?

12       A.    Yes, around there.

13       Q.    So it's your testimony that you paid all the

14  district assessments prior to 1995?

15       A.    Your question again.

16       Q.    It's your testimony that you paid all of the

17  Metropolitan District bills prior to 1995?

18       A.    I cannot say, "Yes" or "No."  I don't have any

19  record with me, but I know that we paid them.  I don't have

20  my record, so I cannot say, "Yes" or "No."

21       Q.    But it's your testimony that you made some

22  payments --

23       A.    That's correct.

24       Q.    -- to the district.

25       A.    That's correct.

7bc853b9-2e32-48d8-a774-0ea760a3a76a

Athuahene vs. Caponetto

8/13/2003

Steve Atuahene

Page 44

1          Q.    I have nothing further.  That's it.

2                THE COURT REPORTER:  Are you going to read and

3    sign the transcript?

4                THE WITNESS:  Yes.

5

6                (Deposition concluded at 11:04 a.m.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

7bc853b9-2e32-48d8-a774-0ea760a3a76a

Athuahene vs. Caponetto

8/13/2003                                                                    Steve Atuahene

Page 45

```
 1                           JURAT

 2

 3

 4

 5        I, Steve Atuahene, do hereby certify that the

 6   foregoing testimony given by me on August 13, 2003, is true

 7   and accurate, including any corrections noted on the

 8   correction page, to the best of my knowledge and belief.

 9

10                            _____

11                            Steve Atuahene

12

13

14

15

16

17

18        Subscribed to and sworn before me on this

19   _____ day of _____, 2003.

20

21        My Notary Expires:_____

22

23

24

25
```

Brandon Smith Reporting Service

Athuahene vs. Caponetto

8/13/2003                                                          Steve Atuahene

Page 46

```
 1                     CORRECTION SHEET

 2

 3            I, Steve Atuahene, do hereby certify that the

 4    following corrections and additions are true and accurate

 5    to the best of my knowledge and belief.

 6

 7    CORRECTION           PAGE      LINE          REASON

 8    _____

 9    _____

10    _____

11    _____

12    _____

13    _____

14

15    DATE_____

16

17    At_____ in said County of

18    _____, this _____ day of

19    _____, 2003, personally appeared Steve

20    Atuahene, and he made oath to the truth of the foregoing

21    corrections by him subscribed.

22

23    Before me, _____, Notary Public

24

25    My Notary Expires:
```

7bc853b9-2e32-48d8-a774-0ea760a3a76a

Athuahene vs. Caponetto

8/13/2003                                                              Steve Atuahene

Page 47

```
 1                   STATE OF CONNECTICUT

 2

 3          I, Kathleen A. Morin, a Notary Public duly

 4   commissioned and qualified in and for the State of

 5   Connecticut, do hereby certify that pursuant to notice

 6   there came before me on the 13th day of April, 2003, the

 7   following-named person, to wit: Steve Atuahene, who was by

 8   me duly sworn to testify to the truth and nothing but the

 9   truth; that he was thereupon carefully examined upon his

10   oath and his examination reduced to writing under my

11   supervision; that this deposition is a true record of the

12   testimony given by the witness.

13          I further testify that I am neither attorney

14   nor counsel for nor related to nor employed by any of the

15   parties to the action in which this deposition is taken,

16   and further that I am not a relative or employee of any

17   attorney or counsel employed by the parties hereto, or

18   financially interested in this action.

19          IN WITNESS THEREOF, I have hereunto set my hand

20   this 21st day of August, 2003.

21

22          _____

23          Kathleen A. Morin, Notary Public

24          My Notary Expires: March 31, 2008

25
```

Brandon Smith Reporting Service

7bc853b9-2e32-48d8-a774-0ea760a3a76a

Athuahene vs. Caponetto

8/13/2003

Steve Atuahene

Page 48

```
 1                    BRANDON SMITH REPORTING SERVICE, LLC
                              44 CAPITOL AVENUE
 2                            HARTFORD, CT 06106
                               (860) 549-1850
 3                          FAX: (860) 549-1537
 4
 5      August 21, 2003
 6
        STEVE ATUAHENE
 7      7000 Woodbine Avenue
        Philadelphia, PA 19151
 8
        RE: STEVE AUTAHENE VS. CAPONETTO ENTERPRISES LLC, PRECISION
 9      FOREIGN CAR SERVICE, INC. AND VALDIS VINKELS, ESQ. -
        3:01:CV2270(AWT)
10
        Dear Mr. Atuahene:
11
        Enclosed please find a copy of your deposition taken on
12      AUGUST 13, 2002, in the above-captioned case.  The original
        jurat and errata sheets are enclosed.  Please note that you
13      are allowed 30 days to read and sign this deposition
        transcript as the Practice Book provides.
14
        Please return only the original notarized jurat and errata
15      sheets to ATTORNEY VINKELS for filing, along with copies to
        other counsel.
16
        Thank you for your prompt attention to this matter.
17
18      Sincerely
19
20      Kathleen A. Morin, Court Reporter
21      CC: Valdis Vinkels, Esq.
22
23
24
25
```

Brandon Smith Reporting Service